355 F.Supp.2d 1008 (2005)
Mark WELCH, Plaintiff,
v.
Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.
No. 403CV1395SNL, DDN.
United States District Court, E.D. Missouri, Eastern Division.
January 12, 2005.
*1009 Philip A. Senturia, Gateway Legal Services, Inc., St. Louis, MO, for Plaintiff.
Joseph B. Moore, Office of U.S. Attorney, St. Louis, MO, for Defendant.

REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
NOCE, United States Magistrate Judge.
This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Mark Welch for disability benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and for supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for a recommended disposition under 28 U.S.C. § 636(b).

I. BACKGROUND

A. Plaintiffs Application and Medical Records
In September 2001, plaintiff filed his application for disability and SSI benefits, alleging he became disabled on May 1, 2000, at age 37. Plaintiff states he is unable to engage in substantial, gainful employment due to major recurrent depression and borderline intellectual functioning, low energy, a lack of motivation, a lack of ambition, rage, temper outbursts, homicidal ideations, sleep problems, poor concentration, mood swings, social withdrawal, difficulty making decisions, poor memory, low stress tolerance, and sleeping too much. Prior to the instant application, plaintiff filed for disability benefits on January 1, 1997, claiming disability as of September 13, 1996. This application was denied on February 18, 1997. (Tr. 16, 60, 63, 92.)
*1010 Plaintiffs earnings records beginning in 1980 show earnings as follows:

 1980 $ 143.84 1991 $ 5,183.76
 1981 65.32 1992 7,548.22
 1982 319.10 1993 16,240.68
 1983 2,234.66 1994 2,242.76
 1984 1,978.36 1995 1,027.50
 1985 2,655.42 1996 7,151.12
 1986 1,383.54 1997 2,710.65
 1987 1,286.64 1998 4,394.60
 1988 7,821.85 1999 2,037.96
 1989 5,717.22 2000 6,458.23
 1990 12,664.32 2001 692.50

(Tr. 76-82.) Plaintiff lists his previous occupations as decorator, dismantler, mail clerk, mechanic, and stocker, with his most recent work as a convention decorator and retail stocker, respectively, ending in April 2000. He reports that his impairments have caused difficulties with concentration and memory, as well as a lack of ambition. (Tr. 71-82, 93, 106-11,121.)
In a December 17, 2001, claimant questionnaire, plaintiff described his relevant symptoms as "sleeping a lot, lack of motivation, poor concentration, anxiety, depressed mood, disturbed sleep, anger outbursts [and] ... racing thoughts," with no improvement since onset. Plaintiff reports these symptoms occur on a daily basis, and are caused or made worse by a chemical imbalance, and arguing and fighting with others. Plaintiff states he can find short term relief from these symptoms by taking a drive or sleeping. He also taxes Zyprexa[1] and Zoloft[2] for management; however, reports these medications make him drowsy and increase his appetite. (Tr. 120.)
With respect to activities of daily living, plaintiff resides with his parents, in their home. He reports arguing with his family "all the time." Plaintiff reports sleeping constantly, but not restfully, and having "bad dreams." Plaintiffs ability to self-groom varies with the day. He has no difficulty preparing meals, and is able to shop, do laundry, do dishes, and mow the lawn. (Tr. 121,123.)
Plaintiff enjoys motocross, bike riding, and building models. He reports a change in his ability to engage in these activities due to a lack of finances. Plaintiff enjoys watching television and listening to the radio. He does not read for entertainment, but reports no difficulty reading. Plaintiff leaves his home daily for appointments, to visit friends, or go to the country. He reports walking, driving, and riding with "friends" as primary modes of transportation, and having no difficulty driving. It would appear, however, that he has not had a valid driver's license for the past seven years, stating on his application "that he [d]id have a valid driver's license about 7 years ago." (Tr. 122.)
On December 17, 2001, plaintiffs BJC Healthcare case manager, Kristyn Fantroy, completed an interested "third party" daily activities questionnaire. Ms. Fantroy reported plaintiff has a poor memory, poor concentration, anxiety, the inability to sit still, and a lack of motivation to participate in treatment because of his depression. She noted no significant changes in plaintiffs condition, with the exception of improved treatment compliance. She reported further that plaintiff has difficulty getting along with family members, and that plaintiff reports his parents do not understand his mental illness and they want him to work and not stay home on daily basis. Plaintiff does, however, get along well with Ms. Fantroy, and she has not observed him engage in any unusual behaviors. (Tr. 124.)
*1011 On August 6, 1974, plaintiff was evaluated, at age 11, by Robert C. Haegg, supervisor at the special district evaluation clinic, for behavior and/or learning disorder services. At that time, the examiner found plaintiff to be experiencing considerable academic difficulties with arithmetic, information, vocabulary, and eye-hand coordination, as well as exhibiting little ability to utilize short term visual memory, mild visual-perceptual, visual-motor impairment, markedly depressed organizational skills, and functional levels of cognitive development in the low-average range. However, the examiner concluded that plaintiffs intellectual potential was greater than formerly measured. Mr. Haegg recommended that plaintiff be placed in an adjustment classroom for the learning disabled. (Tr. 126-31.)
On September 19, 2000,[3] plaintiff was seen by a psychiatrist[4] at BJC Behavioral Health. The record indicates that plaintiff referred himself for follow-up care because he "wanted to get on my meds." He was not sleeping and feeling depressed, with no appetite, motivation, or concentration; he was mostly watching television. He stated he had feelings of hopelessness at times, he had a bad temper, he was easily irritable, and he had mood changes. Plaintiff reported seeing a psychiatrist for the first time in 1995 after accidentally shooting himself in the head. Since then, he has not been hospitalized, nor has he had any suicide attempts. Plaintiff stated he began using alcohol at age 17, and had last used alcohol in April 2000. The provider recommended plaintiff start Zoloft, be reevaluated for his anger spells, and attend alcohol counseling. (Tr. 144-45.)
In January 2001, plaintiff saw Aqeeb Ahmad, M.D., for initial evaluation and treatment. A mental status examination revealed plaintiff was depressed, worried and anxious, dysphoric, tangential, and circumstantial, with poor judgment and insight. Dr. Ahmad diagnosed plaintiff with major recurrent depression, alcoholism and marijuana addiction, antisocial/borderline personality disorder, and a GAF of 51. Plaintiff was instructed to begin Zoloft and abstain from drug and alcohol use. (Tr. 154-55.)
Plaintiff again saw Dr. Ahmad on March 5, 2001. He reported feeling a lot better at that visit, continuing to take Zoloft, and no instances of alcohol or drug use. Dr. Ahmad noted plaintiff was anxious, but had a logical and sequential thought process. He assigned plaintiff a GAF of 59. On a May 14, 2001 visit, Dr. Ahmad noted plaintiff was worried, anxious, angry, and irritable, with tangential speech. Dr. Ahmad prescribed Buspar,[5] in addition to Zoloft, and assessed a GAF of 55. On June 26, 2001, plaintiff continued to report depression. He was assessed as depressed (5 out of 10), worried, anxious, dysphoric, and assigned a GAF of 55. Dr. Ahmad discontinued Zoloft, continuing plaintiff on Buspar, and additionally prescribing Paxil[6] and Trazadone.[7] (Tr. 155-58.)
In August 2001, Dr. Ahmad noted plaintiff continued to have temper problems, *1012 and reported hallucinations after taking Paxil. Dr. Ahmad discontinued Paxil and prescribed Zoloft and Geodon[8] for management. Plaintiff continued to be depressed, dysphoric, anxious, and irritated, with a GAF of 55. On September 24, 2001, Dr. Ahmad noted plaintiff "still had [a] temper," and he reported feeling depressed and "sleepy." He discontinued Geodon and Buspar, requesting plaintiff continue taking Zoloft, and adding Zyprexa. Plaintiffs mental examination and GAF remained unchanged from his last visit. An October 30, 2001, mental status examination revealed plaintiffs mood was "ok." He was euthymic, with logical and sequential thought processes. Plaintiff had an increased GAF of 59. (Tr. 159-61.)
On August 16, 2001, plaintiff was again seen at BJC for a psychosocial/clinical assessment. The record shows that plaintiff sought treatment to receive medicine to control his depression. The case manager's notes indicate plaintiff has had multiple DWI convictions, left a court-ordered halfway house placement, and was convicted of a Class C felony in a child support case. Plaintiff lost his driver's license in 1995, and was eligible to apply for a new license in November, 2000; plaintiff had not renewed his license at the time of evaluation. Plaintiff complained "that his temper is back and worse now," and of depression, anger outbursts, nightmares, trouble sleeping, and excessive thinking. He reported taking Buspar and that it was effective, but that he had stopped taking Paxil because it was making him see things. The case manager noted that plaintiff had an upcoming appointment with Dr. Ahmad, but plaintiffs compliance with Dr. Ahmad had been poor. Dr. Ahmad's office had indicated the doctor would not continue to see plaintiff if he did not make the next appointment. Plaintiff did keep the appointment and was prescribed Zoloft, Buspar, and Geodon. Ms. Fantroy's notes further indicate that plaintiffs last drink was approximately one month prior to the evaluation. Plaintiff denied that drinking was a problem, and that he engaged in drug use. (Tr. 146, 148.)
The notes further indicate that plaintiff has no income but pays his court-ordered child support doing odd mechanic jobs. Ms. Fantroy noted that plaintiffs hands and clothes were greasy and dirty, reflective of his mechanic work. (Tr. 146, 149.)
The plaintiff was diagnosed with major depressive disorder, recurrent, antisocial personality disorder, and a global assessment of functioning (GAF) of 55. He was directed to abstain from street drugs and alcohol, and continue AA participation. Ms. Fantroy suggested referral to vocational rehabilitation and an anger management group, that plaintiff complete Medicaid and SSI applications, that plaintiff maintain compliance with psychiatric treatment and medication services under Dr. Ahmad, and that plaintiff complete his probation requirements. (Tr. 148-52).
In January 2002, plaintiff again saw Dr. Ahmad. Plaintiff continued to report depression. At this visit, Dr. Ahmad discontinued Zoloft, increased the dosage of Zyprexa, and prescribed Fluoxetine.[9] Plaintiff was noted to have a continued depressed mood, and euthymic and dysphoric affect. His GAF was 61. (Tr. 191.)
On February 2, 2002, non-examining, non-treating psychologist, Ricardo C. Moreno, *1013 Psy.D., completed a psychiatric review and mental residual functional capacity (RFC) assessment. Dr. Moreno noted plaintiff had major depressive disorder recurrent, antisocial personality disorder, and a history of alcohol and marijuana abuse. With respect to functional limitations, Dr. Moreno assessed plaintiff has a moderate degree of limitation in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. Plaintiff did not exhibit any episodes of decompensation. (Tr. 162-72.)
With respect to plaintiffs RFC, Dr. Moreno found plaintiff had no significant limitation with respect to the ability to understand and remember short, simple directions, the ability to carry out short and simple instructions, the ability to make simple work-related decisions, and the ability to ask simple questions or request assistance. Plaintiff was assessed as moderately limited in his ability to remember locations and work-type procedures, to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and punctuality, sustain a routine without supervision, coordinate with or near others absent distraction, complete a normal work day/week without interruptions from psychological symptoms, interact appropriately with the public, get along with coworkers and to maintain appropriate social behaviors, accept instructions and respond appropriately to criticism from supervisors, adapt to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel and use public transportation, set realistic goals, or make plans independent of others. (Tr. 176-77.)
A February 2002, BJC Behavioral Health progress report revealed plaintiff stopped taking all his medications, stating they made him dizzy. Plaintiff further reported not drinking alcohol for the two weeks prior to the assessment. Dr. Ahmad discontinued Prozac [10] and Zyprexa, and prescribed Wellbutrin.[11] He was assigned a GAF of 61, and assessed mild symptoms with regard to emotional withdrawal and sleep disturbances. Plaintiff was found to have moderate symptoms with respect to tension, depressed mood, and motor retardation. Plaintiff exhibited moderately severe symptoms with emotional withdrawal. (Tr. 186-87.)
On March 19, 2002, plaintiff saw Dr. Ahmad. At this visit, plaintiff was assigned a GAF of 65. Dr. Ahmad discontinued Zyprexa and increased plaintiffs Wellbutrin dosage. At this visit, plaintiff informed Dr. Ahmad he could not "keep a job." (Tr. 190.)
On June 18, 2002, plaintiff reported difficulty concentrating and keeping a job. Dr. Ahmad discontinued Wellbutrin, and prescribed Concerta[12] and Vividil. Plaintiff was diagnosed with attention deficit disorder (ADD), and assigned a GAF of 65. (Tr. 189.)
Additionally, on June 18, 2002, Dr. Ahmad completed a mental medical source statement. He assessed plaintiff had moderate limitation in his ability to relate in social situations, interact with the public, accept instructions and criticism, maintain socially acceptable behavior, understand and remember simple instructions, *1014 make simple work-related decisions, respond to changes in the work setting, and work in coordination with others. He found marked limitation in plaintiffs ability to cope with normal work stress, function independently, behave in an emotionally stable manner, maintain reliability, maintain regular attendance, perform at a consistent pace without an unreasonable number of rest periods, and sustain an ordinary routine without special supervision. Dr. Ahmad reported plaintiff had four or more episodes of decompensation during the previous year, with a substantial loss in the ability to understand, remember, and carry out simple instructions, respond appropriately to supervision, coworkers and usual work situations, and deal with changes in a routine work setting. He diagnosed plaintiff with ADD, major depression, and mixed personality disorder, with a current GAF of 65 (GAF of 45 being the lowest in the previous year). (Tr. 182-85.)
Plaintiff again saw Dr. Ahmad on October 4, 2002. This record shows plaintiff cancelled his appointment on August 2, 2002, and "no showed" his appointments on August 16, 2002, and September 25, 2002. Plaintiff informed Dr. Ahmad he was asked to leave his parent's home, because of his anger. He denied alcohol or drug use for the two weeks prior to his appointment. Plaintiff presented as anxious, with tangential and circumstantial thought process. Dr. Ahmad assigned a GAF of 60. (Tr. 188.)

B. Plaintiff's Hearing Testimony
The ALJ conducted a hearing on January 2, 2003, at which plaintiff was represented by counsel. Plaintiff testified that he has lived in a home with his parents since 2000. Plaintiff characterized his relationship with his parents as "so, so" and "if anything, it's probably on the bad side." Plaintiff testified they have conflicts of interest, which turn into arguments. He currently has no source of income and receives $135.00 per month in food stamps. Plaintiff is divorced, with a ten year old child and an eighteen year old child resulting from that marriage. Plaintiffs children do not live with him. (Tr. 33-34, 42.)
With respect to his education, plaintiff testified that he completed the ninth grade, and received special education for ADD. Beyond the ninth grade, plaintiff received one year of mechanic's training working with "fixed automobiles." Plaintiff testified that he worked as a mechanic for approximately ten years. In the last fifteen years, plaintiff worked also as a part-time trade show decorator. Plaintiff stopped working in this position in 2000, because "[t]hey slowed down." Plaintiff testified his position as a "decorator" was his last job. He testified that the main problem he has with his ability to work is "[j]ust getting up and motivating, getting myself motivated. I just don't have no ambition." When he was working, plaintiff testified his attendance was poor, causing friction between plaintiff and his supervisors. Plaintiff never collected unemployment, but is required to seek employment as a condition of probation. (Tr. 34-37, 42, 44.)
Plaintiff testified he saw Dr. Ahmad for depression, approximately once a month for one year, until October 2002. Plaintiff left Dr. Ahmad's care, because he felt Dr. Ahmad was not focusing on his problems. Plaintiff obtained a new psychiatrist, and was planning on beginning treatment with this doctor in January 2003, but had not done so at the time of the hearing. Plaintiff also receives assistance from a caseworker at BJC. The BJC caseworker assists plaintiff in making appointments, setting goals, and obtaining mental health treatment. Plaintiff testified that his depression has caused him to loose concentration *1015 since 1995, affecting both his work and home life. (Tr. 37-38, 42-44.)
Plaintiff testified that, on a daily basis, he has low energy and sleeps off and on. He also has difficulty with consistent decision making. At the time of the hearing, plaintiff testified he engages in household chores, including taking out the trash, doing the dishes, assisting his disabled father, and occasionally cooking. When he is not doing household chores, plaintiff watches television. With respect to socialization, plaintiff reports having no friends, and is involved in no social clubs or organizations. Approximately every other month, plaintiff visits with his brothers and sisters. (Tr. 38-40-42.)
Plaintiff testified to past alcohol and marijuana use, and, at the time of the hearing, he reported "doing good." He testified that he had not recently used marijuana, and, with the exception of New Year's Eve, he had not imbibed alcohol in three months. Plaintiff testified that he believes his depression occurred before his problems with alcohol. (Tr. 40-41.)

C. The ALJ's Decision
In a February 25, 2003, decision denying benefits, the ALJ determined plaintiff is not disabled as defined by the Social Security Act. Upon review of the plaintiffs medical records, the ALJ determined
[t]he medical evidence indicates that the claimant has the following medically diagnosed impairments: major recurrent depression, alcohol and marijuana addiction, and anti-social personality disorder. These impairments are severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.
The ALJ was not able to determine with certainty whether plaintiff had "engaged in substantial gainful activity since May 1, 2000, his alleged onset date." (Tr. 16, 18.)
Addressing the medical evidence at issue, the ALJ found little medical evidence of psychological problems during plaintiffs purported period of disability. The ALJ noted further that the record does not indicate regular counseling for depression and homicidal ideation. Moreover, despite plaintiffs reports that he completed three separate substance abuse programs, the ALJ found it notable the record does not reflect regular visits to Alcoholics Anonymous (AA) or Narcotics Anonymous (NA), or reflect instances of decompensation since September 2000. (Tr. 19.)
The ALJ detailed the current Social Security regulation with respect to alcoholism and drug addiction. Specifically, he noted
that a claimant can no longer be considered to be eligible for disability benefit payments under either Title II or Title XVI of the Act if substance addiction is a contributing factor material to any formal finding of disability under the Social Security Act .... A history of alcoholism or drug addiction is still relevant to the extent that it may have resulted in serious secondary damage to a claimant, such as damage to the brain, liver, or other vital organs. That secondary damage, to the extent it may exist in a given case and would continue to exist if the claimant in question were to cease the use of alcohol or drugs, will be considered in evaluating disability cases. Other physical and mental impairments will still be evaluated in accordance with existing law. However, the mere fact that a claimant uses or has used alcohol or drugs, and may even be addicted to the same, is no longer a basis for entitlement to disability benefits under this Act.
Ultimately, the ALJ concluded that "the evidence does not show that his alcohol and drug dependence is disabling in itself, *1016 it does indicate that some of both his mental and physical limitations are due to his alcohol dependence. Even if his mental limitations were disabling, he would be precluded from receiving benefits ...." (Tr. 19.)
Turning to the RFC, the ALJ stated the relevant assessment is to determine plaintiffs RFC "without considering any effects of alcohol or drug consumption." In determining plaintiffs RFC, the ALJ concluded that plaintiffs medical history is not consistent with his alleged impairments and symptoms, noting minimal treatment records and improvement in plaintiffs condition over time. With respect to Dr. Ahmad's mental/medical source statement, the ALJ specifically accorded it little deference, finding the assessment inconsistent with Dr. Ahmad's treatment notes. (Tr. 20.)
With respect to ADLs, the ALJ found plaintiffs activities belie his allegations, and therefore, plaintiff is not fully credible. The ALJ noted that plaintiff reported leaving his job in May, 2000 because of a lack of motivation or ambition, not due to disability. Moreover, Social Security records indicate plaintiff worked in both 2000 and 2001, after the date of alleged disability. While the reported income itself is not enough to amount to substantial gainful activity, the ALJ believed that this income source, coupled with mechanic work plaintiff does for cash, suggests plaintiff will work enough to make his child support payments and nothing more. The ALJ averred further to the fact that plaintiffs claimant questionnaire shows he can engage in a range of daily activities, and no provider has proved contrary by indicating any restrictions. (Tr. 20-21.)
The ALJ set forth the requirements for competitive, remunerative, and unskilled work to "include the abilities to understand, carry out and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting on a sustained basis." The ALJ determined plaintiff could engage in the mental demands of competitive work, finding
[plaintiff] would have a mild to moderate difficulty in maintaining social functioning, plus a moderate difficulty in maintaining concentration, persistence or pace, but only with regards to unfamiliar complex tasks; and he has no more than a mild limitation in concentration, persistence or pace with familiar tasks and unskilled tasks that can be learned after a short demonstration or within 30 days.
(Tr. 21-22.)
The Appeals Council declined further review. Hence, the ALJ's decision became the final decision of the defendant Commissioner subject to judicial review. (Tr. 6-8.)
In his appeal to this court, plaintiff alleges that the ALJ (1) improperly applied Social Security rules related to substance abuse; (2) incorrectly determining plaintiffs RFC absent substantial evidence of record; and (3) improperly determined plaintiff could return to past, relevant work.

II. DISCUSSION

A. General legal framework
The court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id.; accord Jones v. Barnhart, 335 F.3d 697, 698 (8th Cir.2003). In determining whether the evidence is substantial, the *1017 court must consider evidence that detracts from, as well as supports, the Commissioner's decision. See Brosnahan v. Barnhart, 336 F.3d 671, 675 (8th Cir.2003). So long as substantial evidence supports the final decision, the court may not reverse merely because opposing substantial evidence exists in the record or because the court would have decided the case differently. See Krogmeier, 294 F.3d at 1022.
To be entitled to benefits on account of disability, a claimant must prove that he is unable to perform any substantial gainful activity due to any medically determinable physical or mental impairment, which would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A) (2004). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920 (2003); see also Bowen v. Yuckert, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (describing the framework); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir.2003). If the Commissioner can find that a claimant is or is not disabled at any step, a determination or decision is made and the next step is not reached. 20 C.F.R. § 404.1520(a)(4).

B. Evaluation of Alcohol and Drug Abuse
In 1996, the Social Security Act was amended to reflect changes in the award of benefits related to substance abuse. The statute reads, in pertinent part, that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C), amended by Pub.L. No. 108-203 (March 2, 2004). This amendment is interpreted as barring benefits "if alcohol or drug abuse comprises a contributing factor material to the determination of disability ...." Brueggemann v. Barnhart, 348 F.3d 689, 693 (8th Cir.2003).
20 C.F.R. § 404.1535(b) details how the Commissioner is to evaluate if substance abuse is material in determining disability.
(a) General. If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.
(b) Process we will follow when we have medical evidence of your drug addiction or alcoholism.
(1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
(2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
(i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.
(ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.
*1018 20 C.F.R. § 404.1535(b). "The ALJ must reach [a] determination [of disability] initially... using the standard five-step approach described in 20 C.F.R. § 404.1520 without segregating out any effects that might be due to substance abuse." Brueggemann, 348 F.3d at 694.
In the instant action, the undersigned concludes the ALJ did not adequately evaluate plaintiffs disability pursuant to Social Security regulations. The ALJ made findings that plaintiffs alcohol and drug dependence is not disabling, of itself, but, that a portion of both his medical and physical limitations are due to substance abuse. Upon making these findings, the ALJ concluded that "[e]ven if his mental limitations were disabling, he would be precluded from receiving disability benefits ...." (Tr. 19.) The ALJ then establishes that the current law requires him to determine plaintiffs RFC absent considering the effects of alcohol and drug use.
This portion of the ALJ's opinion does not accurately reflect the Social Security regulations or apply Eighth Circuit precedent. The ALJ is required to make findings pursuant to the five-step regulatory framework (20 C.F.R. §§ 404.1520, 416.920), taking into account plaintiffs alcohol and drug dependence when assessing his RFC, and ability to engage in past, relevant work or other work in the national economy. See Fastner v. Barnhart, 324 F.3d 981, 985 (8th Cir.2003); Woods v. Barnhart, 2004 WL 1558794, No. 03-2592, slip op. at *8 (D.Kan. July 12, 2004) ("For purposes of step five, the ALJ is required to determine, as a threshold matter, whether plaintiffs mental impairment is disabling, without considering whether his alcoholism or substance abuse contribute to the impairment."); cf. Brueggemann, 348 F.3d at 694 ("Substance use disorders are simply not among the evidentiary factors our precedents and the regulations identify as probative when an ALJ evaluates a physician's expert opinion in the initial determination of the claimant's disability.") (emphasis added).
The Commissioner argues that the ALJ did consider all plaintiffs impairments, including the effects of substance abuse, determining he was not under a disability and obviating the need to evaluate whether plaintiff is disabled despite substance use. A review of the ALJ's opinion does not reveal any evidence he did, in fact, include the effects of substance abuse in his initial disability assessment. This is further buttressed by the ALJ's belief that he was bound by regulations to determine plaintiffs RFC without considering the effects of alcohol and drug consumption. Given these facts, this is not a case where the undersigned concludes the ALJ's evaluation was appropriate, yet his decision reflects a mere defect in opinion writing. See McGinnis v. Chater, 74 F.3d 873, 875 (8th Cir.1996) (noting that asserted errors in opinion-writing do not require a reversal if the error has no effect on the outcome).
The undersigned has not reached the merits of plaintiffs additional grounds for appeal. The case should be remanded so that the ALJ can reevaluate plaintiffs RFC and ability to return to past, relevant work. A remand for this purpose will render moot the ALJ's current RFC assessment.

RECOMMENDATION
For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be reversed under Sentence 4 of 42 U.S.C. § 405(g) and the action be remanded to the Commissioner for further proceedings consistent with this opinion. On remand, the ALJ should make a disability determination based on the fivestep sequential evaluation (20 C.F.R. *1019 §§ 404.1520, 416.920), without segregating out any effects that may be due to substance abuse. Should the ALJ find plaintiff is disabled, then he is to evaluate plaintiffs disability as detailed in 20 C.F.R. § 404.1535(b).
The parties are advised that they have ten (10) days in which to file written objections to this Report and Recommendation. The failure to file timely, written objections may waive the right to appeal issues of fact.
NOTES
[1] "Zyprexa is indicated for the management of the manifestations of psychotic disorders." Physician's Desk Reference (P.D.R.), 1789 (55th ed.2001).
[2] "Zoloft ... is indicated for the treatment of depression." Id. at 2554.
[3] The record of this visit is handwritten, and difficult to read.
[4] The name of the provider is unclear. It appears to read as N. Raskol. (Tr. 145.)
[5] Buspar is indicated for the management of general anxiety disorder. Buspar, at http://www.buspar.com/ (last visited January 6, 2005).
[6] "Paxil is indicated for the treatment of depression." P.D.R., at 3115.
[7] "Trazodone is indicated [f]or the symptomatic relief of depressive illness." Internet Mental Health, at http://www.mental-health.eom/drug/p30-d03.html#Head_2 (last visited January 6, 2005.)
[8] Geodon is indicated for the treatment of schizophrenia, bipolar disorder, and agitation accompanying these conditions. Geodon, at http://www.pfizer.com/download/uspi_geodon.pdf (last visited January 6, 2005.)
[9] "Fluoxetine is used to treat depression." Pills 2000, at http://www.pills2000.com/Fluoxetine.html?a=67082 (last visited January 6, 2005).
[10] Prozac is indicated for the treatment of depression. Prozac, at http://www.pr ozac.com/how_prozac/prozac_weekly_right.jsp?reqNavId=2.4.6 (last visited January 6, 2005).
[11] "Wellbutrin is indicated for the treatment of depression." P.D.R., at 1486.
[12] "Concerta is indicated for the treatment of Attention Deficit Hyperactivity Disorder." Id. at 3475.